Our next case is Netlist, Inc. v. Samsung Electronics Co., Ltd. 24-2203. Okay, Counselor Cordell, you reserve five minutes to rebuttal. Yes, Your Honor. We're ready when you are. May it please the Court, Ruffin Cordell for Appellant Samsung. I invited Mr. Lincoln to become the appellant given that he's sitting on this side, but he declined. I'd like to start my argument with the Court's permission in an unusual spot. I'd like to start with damages because I think those issues are more far-reaching in this case than any of the other. But time permitting, I'd love to come back and talk about Netlist's, in our view, complete disregard for the Court's claim construction for terms like deram circuit and bite. We think those are profound as well. But starting with damages, we have researched and researched and researched, and we have not found a single case of this Court that awarded 100% of the revenue associated with a patented invention to the patentee. Not a single one. Netlist's expert simply disregards the basic construct of the hypothetical negotiation where a party like Netlist and a party like Samsung meet across the table. And Netlist says, I've got a patented idea. Samsung says, I make products. And they come to an agreement about how to divide the profit associated with that endeavor. Samsung will have costs. They will have to pay engineers and buy materials and do manufacturing. Why isn't comparing the accused products with the next best non-practicing Samsung products? Why is that not enough? Your Honor, that was a very curious approach. What they did in that sense is they looked to value what they said was the invention by creating essentially a fiction, creating a comparison between the current Samsung product and then in some cases some that were simply fanciful, that were made up. The best example of this is the 918054 product where they sort of posit that the entirety of the delta between DDR4 standard memory and DDR5 standard memory is attributable to these two patents. It's a breathtaking leap. They cite a Samsung document in their briefing talking about the fact that there was a 30% improvement in power efficiency between the entirety of the DDR4 standard and the DDR5 standard. They then take a product that they made up and they said if we took one of these products and we ripped what's called the PMIC or PMIC off the board and then valued that, we would compare the delta and that would give us an idea of the revenue, not the profit, the revenue associated with making the change to the product. So we have a couple of problems with that. Number one, we shouldn't be talking about revenue. In a hypothetical negotiation, the vast body of case law of this court talk about splitting the profits and they walked away from all of that. But Mr. Kennedy's theory was not based on splitting profits. His theory was based on assessing the value of the invention. Is that right? But the assessment of the value that he used was actually the revenue. It wasn't the profit. It was the incremental revenue at which he said was part of the equation. I agree. It should be part of the equation. It should be the first step. The first step should be to calculate the revenue associated with it. We then reduce that to the profit by apportioning out the costs that are associated with that. So in the hypothetical construct, Samsung has a reason to do this. Well, you don't necessarily have to then look to profits. I mean Mr. Kennedy made his argument based upon his assessment of what the value would be based upon the incremental increase in revenue. And I think part of his argument, correct me if I'm wrong, was that the value of the invention would contribute to increased sales, which in and of themselves would increase profits. It was a complicated and perhaps creative, perhaps too creative, but a complex and creative approach to assessing the value as a basis for the damages theory. So again, it would be a good first step, but he then needed to continue down that road and take out the cost that Samsung would bear and then find an equitable division. Is it possible that the value to Samsung of being able to practice this patented technology so as to continue your revenue stream for your larger products is in fact 100% of the revenue that would be generated by practicing this patent? Well, we have a rubric for that, Your Honor. It's called the EMVR, the Entire Market Valuable. And that was available to them if they thought they could achieve that very high bar. I'm not sure that we've said that's the only – I mean just as a factual matter, isn't it possible that this technology was so important to Samsung preserving its position in the marketplace that at the hypothetical negotiation it would say, we will give you every last penny of revenue derived from this patent? You have a chance to argue, of course, on the facts that that wasn't the case here, but I'm not sure what law says that we have to rule that out. Well, because again, the cases like Lindemann tell us that it would be irrational for a party in Samsung's posture to do that. What if it turned out the facts were that this industry is so cutthroat and you've got competitors, and if you don't practice – if you don't get their patented technology on your memory modules, you're going to lose 100% of your larger sales. That's not irrational at that point to pay them every penny of your revenue associated with their technology, is it? Well, first of all, we obviously dispute that on the facts, so I can show you those. Very conclusory testimony at best that established that. But I think that describes the entire market value rule. If in fact this feature was the key to selling the product, if you had to have it, then they would have made an entire market value rule showing. There's a ton of arguments in your briefs. I don't remember entire market value rule. It's there. It's there. My apologies. It is at page 49 of the blue brief. Thank you. And we obviously take issue with the facts of that construct because they absolutely did not make that showing. The best they did is they said Netlist really needs the technology, and they cite it at appendix 56, 93, and 94. But the evidence they use is the prior agreement between the parties where the entirety of the Netlist patent portfolio was licensed to Samsung for $8 million. What page did you direct us from to just start this question? Page 49? Yes, Your Honor. Page 49. The entire market value rule. I think that's what we're talking about. That's right. That's right. Page 49, right above the break. Indeed, even if Netlist intended to pursue all revenue, which it ultimately did, the law requires that Netlist prove that 100% of the incremental revenue was attributable to the patented features. Netlist did none of this and so failed the apportionment test, providing an independent reason why the court should reverse damages. So let me get, if I can, to the idea that let me now jump to the Rambus license, given the time, because this is an independent basis for this court to order a new trial. Netlist intentionally introduced the Rambus license that had a- Help me procedurally on this one. Did you file a motion in Lemonade? Did you make a 403 argument? Did you object to the expert's discussion of Rambus? We did, Your Honor, and we filed a Daubert motion, which was denied. I know about the Daubert. Did you ever make a 403 argument? Because I understand you'd be making a 403 argument now. We are, but we're also making the argument under Daubert that this should form, it should never have been exposed to the jury. So I don't know if we used the number 403 per se or not, whether we cited 403, but that was the gist of our Daubert motion. Because I know you submitted a 28-J letter related to Optus, but I think in Optus we relied solely on Rule 403 as a basis to exclude a license. But this court's law is legion, uniloc, lucent, laser dynamics. We have lots and lots of examples that putting the big number in front of the jury skews the damages horizon, and it's typically dealt with at the Daubert stage because we never want this evidence to find its way before the jury. Making an objection at trial, for example, would be a little late because they would already be exposed to the jury. And you did make that argument at Daubert? We did. It wasn't just that it wasn't comparable. It was, hey, it's going to be too prejudicial to put a $1.1 billion number in front of it. Absolutely, absolutely. That was the entirety, in fact, of our Daubert challenge. And it was the fact that they made no effort beyond the big number to show comparability. Their expert admitted that he didn't look at 99.4% of the patents included in the Rambus license, made no analysis whatsoever. It's not material that their expert ultimately didn't rely on the Rambus license, which, in fact, really reveals their true motives. They didn't really want to use it. I know you're aware the jury ended up awarding only, your client might not say only, but 75% of the damages that Mr. Kennedy opined for, do you say there's not substantial evidence to support that number? And could we not just go directly to that question as we analyze it? Hey, is there substantial evidence? Put aside all the issues he's raising. Is there substantial evidence for at least a 75% overall damages award? So you could, but there are a lot of issues knit up in there. Number one, the Rambus issue can't be ignored. We can't put the cat back in the bag. They've skewed the horizon of damages. All the cases talk about this, that once you put that big number in front of the jury, the 75% doesn't help them. They have skewed that horizon. I haven't gotten to my apportionment issues, but there's been zero apportionment in this case. Again, they claim the entirety of the DDR4 to DDR5 delta for their own, and they can't do that. There are thousands of technologies, thousands of patents that go into that. So on apportionment alone, that 75% verdict can't be maintained. I'm a little bit into my rebuttal time. Should I? Yes, you are. You can stop now. Could I mention just two quick things back on the merits, and that is that with respect to the DRAM circuit, what we can't have is a situation where parties approach a district court, we get to claim construction, and then when we get to trial, it's disregarded, and that's what happened in this case. But here the problem for you, I think, but if I've missed something in the record, I hope you'll point me to it. I think Judge Gilstrap was explicit that he was done with construction, and you were going to present expert testimony if you wanted about what a DRAM circuit is. Did you object to that approach? Did you say, no, respectfully, you're not done with claim construction, you can't put this in front of a jury? We did not. We were happy with the claim construction. The problem is Netlist refused to follow it. So if you look at A5550. Did you object at trial that what they were doing was arguing claim construction in front of the jury? We did. And it began at… It's fine if you want to give me an insight when you get back. I will. But it began, I think, about at 540 is about when my continual objections began. Thank you. Thank you. Counselor? Thank you, Your Honor. May it please the Court. I'm going to begin where my colleague did, which was with the revenues issue and damages. And I will concede that if you're going to claim that in a hypothetical negotiation that the implementer will pay 100% of the incremental, the additional revenues following based on the invention, you're going to have to have case-specific reasons why that would be the result of that negotiation. But here we actually have… And the consequence of that is not that there's no money for Samsung. Samsung continues to make the same profit margin it did, but not the same margin, but the same amount of profit it did on the prior version of these chips. And the reasons given here were very clear and very compelling. Samsung knew that without the innovations, it would be locked out of the market. It would have no profit at all. The sales would evaporate. And so they wouldn't even get its formerly healthy 50% profit margin on the prior version of these chips. And the evidence of that was Legion. If I can point you to page 5699, lines 24 to 25. Hang on a second. Yep. And there's a bunch of these, so I'll walk through them as quickly as I can. Which was the page again? 5699. 5699.  And it says right at the bottom, Samsung needed a 30% increase in power efficiency to make those sales. If you move two pages later to 5701, lines 13 to 17, it says without netless technology, they would lose the sale. They would not be able to sell the product. Appendix 5705, line 22. Speed is critical for this product. Their customers understand that. So with that in mind, how important speed is, just trying to sell the same thing for less, the more likely someone's going to go somewhere else. So this is important for Samsung to retain its market position. And if you go to 5712, line 19, our expert there explains that Samsung knew that was what was at risk because what happened with HBM1 is they got locked out of the market entirely because Hynix beat them to the market. And on top of that, in this negotiation, Kennedy testified that everybody knew that netless did not give naked licenses. It always required the type of joint venture agreement, the type of cooperation that had formerly existed before there was the breach by Samsung. And for that reason, they would require a premium. So if you're looking for the evidence here, the evidence is more than sufficient that based on the relative bargaining position of the parties, Samsung would have given up at least the 75% that the jury awarded. And this is not a question of an entire market value rule. We're not taking a percentage of the total price of the end-user product. This is the incremental benefit of the invention. And it's the incremental benefit done invention by invention, patent by patent. So when my colleague says, oh, no, you just said the difference between DDR4 and DDR5, that's not correct. Kennedy isolated the benefit of the patented features. So, for example, if you turn to page 5332, the 533 of the record, he's talking about just the on-board PMIC, the on-board piece of the power converter, the power management integrated circuit. And then the next page, 53845, he says that led to a 30% increase of power efficiency according to Samsung's own documents. And there's an image in our brief for that. I should be able to point that to you. But there's an image from the Samsung document. And then he converted that 30% savings into a dollar amount. It wasn't the entirety between DDR4 and DDR5. It was patent advance by patent advance specific to the particular technology at issue here. If I could turn really briefly to the Rambus license. That Rambus license was put into evidence after the district court determined, and the district court actually made a finding, that it was comparable. And that's at page 53 of the appendix. And it wasn't relied on by the expert to try and do a calculation. And he specifically told the jury, don't rely on this to do a calculation. It's just the type of background information you need to know and that the parties would have been aware of when they're talking about these types of fundamental advances and that people worry about being locked out of the market. And it is also parallel because it is exactly the same type of negotiating posture everybody was in in Rambus. Rambus, there was a former joint venture between Rambus and Samsung. There was a breach. They got into a fight. There was a patent suit. That's what came out of it. The expert also said, look, yes, 2,000 patents in the Rambus license, six here. But what drove the negotiations were the 10 to 12 that were in litigation. But you have to agree that putting that big number in front of the jury has the potential to impact the outcome in an inappropriate way. I don't think it would impact the outcome in an inappropriate way, Your Honor. It simply shows the background in the parties are looking at is these are very important advances. They make a huge difference. But when you get to the actual calculation, the jury simply sits down and looks and says, does Mr. Kennedy's calculation make sense? Has he looked at the right things? Is the power difference what really matters? Is it 30%? Has he calculated that properly? He hasn't pulled it in. The question is whether putting that big number before the jury is more prejudicial than probative. Well, there was no 403 objection. So the substantially more prejudicial than probative value standard is out. It's simply a Daubert question. Is this so far off that you really can't even put it before the jury? And since it wasn't part of the licensing methodology, I'm not sure what Daubert has to do with it. Daubert is a reliable method, reliably applied. This isn't about the reliability of those methods. Mr. Cornell says he made the prejudice argument at Daubert. Do you disagree? So he made the argument that it could skew the damages horizon. But the skew the damages horizon language is about prejudice. Yes, if you let this in improperly, that skews the damages horizon and is therefore prejudicial. You can't unring the bell. It's not an argument that, wait a minute, rule 403, and if you're making a rule 403 argument, every good trial lawyer, and Mr. Cornell is excellent, would say rule 403. And it's not there. You would recite the standard, substantially more prejudicial than probative. That's not there. The argument is simply don't let this in. It's a matter of it's not sufficiently comparable. It skews the damages horizon. It's simply not a proper objection. This was brought in for a particular purpose. It wasn't for the actual calculation, and any impact was. What about the Rambus license? Wouldn't that have been less prejudicial? Or at least we wouldn't have that issue as big as it is today. Yes, so the prior licenses that argued between us and Rambus. Excuse me. You're talking about our prior license? The Rambus license, yes. Yeah, so the Rambus license, I think, is the one we were just discussing was the Rambus license that wasn't within that list. And so I think that is properly before the court but not used for the calculation. If Your Honor's asking about the two other licenses that were not included in our calculation, those were excluded because they included joint venture elements that were extraordinarily hard to value. It's not like you can just do an unpacking if there's cross licenses for patents. It's a joint venture, and it just makes it not comparable. And the jury might disagree with Mr. Kennedy and think, no, I'm going to go with those because opposing counsel put in those licenses. But that's simply a jury argument. Can I ask you on the 060 and the 160 patents, there's a damages theory that I think in part relies on believing that the ability to do the eight high stacks requires or was impossible before your two patents. Is that a component of the theory? And if so, is that supported by the evidence? Yes, it is supported by the evidence, and that was part of our theory. What it enabled was eight high stacks. And that's because before, you couldn't go up to eight high stacks because you'd have too much load. It just wouldn't move. Wasn't there evidence presented that you could have done it before the 060 and the 160? They did argue otherwise, and that's just simply a jury question. Could you do it or couldn't? And the jury apparently agreed with us that you could not. And the reason is because the former, what was called a multi-drop system, is if you went with eight things, you'd have your TSV, your channel, go through eight different dyes. And going through eight different dyes, that load is incredible. But if you take them and you separate them into groups, one TSV is connected to two, one is connected to three, and other one's connected to two, you actually have much less load. And then there was a further invention we didn't discuss, but balancing the load. But all these things point to one result. These are factual questions that are being disputed, for which there was substantial evidence, and that the jury was entitled to rule in our favor. If there's any further questions, maybe I should turn to the DRAM circuit question, about whether or not the jury had substantial evidence, sufficient evidence, to hold that the infringing array dyes were array dyes that were not DRAM circuits. And I think I would like to start out with, that was Samsung's construction. Based on a disclaimer, they wanted to argue that they got this construction, an array dye that is different from a DRAM circuit. And Samsung argues now, something that it probably could not have gotten if it asked for it as a further construction, that if it has DRAM cells, the millions of tiny little cells that make up every DRAM array dye or DRAM circuit, then it becomes a DRAM circuit. Because an array dye that's made of tiny cells is not a claimed array dye, but instead is an excluded DRAM circuit. And a reasonable jury could reject that for at least three reasons. First, the jury's had actual pictures of DRAM circuits, of disclaimed DRAM circuits. If you turn to page 22,116, there's a picture of Rajan's. Stacked DRAM circuits. And these are these boxes, these modules, these monolithic pieces. And then if you turn to page 16,341, you see that there's not microscopic cells. There are these big blocks. So as Dr. Bregoli said, no, array dyes have DRAM cells in them. But that's not the DRAM circuit that they claim construction's talking about. The Samsung's corporate representative, Kim, testified, and this is at 20,2005, that Samsung's dyes have DRAM cells in an array format. But they didn't equate DRAM circuits or array dyes with DRAM cells. And it doesn't even make sense in terms of the words of the construction. The construction is an array dye that is different from a DRAM circuit. It doesn't say an array dye that is not made of DRAM cells. And finally, if you turn to claim 29 of the 060 patent, this is appendix 718, lines 26. They're column 26, line 55. It actually has a claim. It's page 7, actually 718. Or maybe 7, I'll do 7 or 2. 718. Let's do 718. It's the same claim. All right. It actually has a claim there, claim 29. And it claims a plurality of DRAM packages. So we know we're DRAM. And you look down to line 61. It says, a plurality of array dyes arranged in a stack. So this is array dyes in a stack that's DRAM. It's going to have DRAM cells. Either that disclaimer does not lock out everything that's DRAM, does not lock out everything with DRAM cells, or the examiner made a giant mistake and couldn't have issued claim 29. It can't be right. Why isn't all of this a claim construction dispute and error in front of the jury? That is exactly what it is. And it's a claim construction dispute in which Samsung is basically arguing claim construction. And the jury just had to have substantial evidence. And there was ample evidence. I'm probably not being clear in my question. If it's a claim construction dispute, doesn't it mean the court had an obligation to resolve it and not let you all play this out in front of the jury? No, because O2 Micro gives district courts that obligation. But it has to be apparent that the parties have a claim construction dispute. And in Coffman versus Microsoft, the court says, there's not necessarily an O2 Micro decision whenever further claim construction could resolve the party's dispute. Rather, the party must sufficiently request further construction of the relevant limitation to raise an actual dispute. Everybody was content to let it go with the precise construction given by the district court. But the construction is whatever we're talking about, error or die, it's not a DRAM circuit. And at a certain point, you wanted to object and get a further ruling on what a DRAM circuit was. And then you withdraw that objection. And I think Judge Gilstrap says, you can have your experts testify in front of my jury as to what a DRAM circuit is and therefore isn't. And why is that not an error? Why isn't that just saying, let's have a claim construction hearing in front of a jury? Well, no, that's having a dispute before the jury about what is and isn't within the claim construction that's actually issued. Remember, this is Samsung's claim construction. Samsung asked for an array die that is not a DRAM circuit. And so the question for the jury is, do Samsung's products qualify to have array dies? Or are they instead DRAM circuits? If I think this is a claim construction issue, an O2 micro issue, have we said that that can be waived? And would you argue that they failed to preserve the issue? Doubly, Your Honor. First, because it was their claim construction. They never sought anything more. They're specifically told by the district court it was going to go to the jury. They didn't object. And at no point did they say to the district court, ah, in the middle of trial, it looks like we're fighting about the meaning of terms. We need a claim construction. Kaufman is very clear that you can't just sort of sandbag the judge in that way. But finally, if I can make one last point on this in the 47 seconds remaining, and that is that there was ample evidence from which a jury could understand that the array dies here were not DRAM circuits. And that's because the DRAM circuits have sort of an independence, a standalone aspect, that an array die doesn't. So first, if you look at the patent itself, it explains that the, sorry, maybe if I go to our expert. Our expert at page 5510 said, if you have a DRAM circuit, you can connect it directly to a microprocessor and run a program. So it can be put next to and hooked up with your microprocessor. And that's why you hook them together as separate wires. But if you're looking at the array dies here, they require a control die. They're not capable of talking to anything on its own. They don't have that independence. And that's appendix 710, lines 10 to 35. And Bergogli, therefore, said, look, a DRAM is monolithic. It's a standalone device. DRAM circuits have that electronic independence. If you remove one, the others won't work. That's appendix 5509. The array dies, by contrast, lack that independence. If you try and tear them apart, they won't work. That's 5509 again. And that's a huge impact. If the court has no further questions, I ask that the judgment be adjourned. Thank you, Your Honor. You have three minutes of time. Thank you, Your Honor. If I could begin where my brother left off, we absolutely did object to their misuse of the other than a DRAM circuit claim construction. It started at 5503. I objected for pages and pages and pages. At appendix 5550, Dr. Bergogli, their expert, said he had no opinion about the plain meaning of DRAM circuit. He feigned ignorance of circuit. I chased him around the courtroom for an hour, and he kept saying, I don't know. It depends on context. And we showed them his own papers. We showed them net lists, filings. We showed them the inventor's statements. They clearly understood what a DRAM circuit was, and they chose not to acknowledge it. And if there's any doubt in your minds, please refer to appendix 22054, which was the discussion in the PTAB argument that we heard argument on this morning by their lead counsel, where he was asked what a DRAM circuit was. And he said a DRAM circuit is a monolithic structure that includes transistors that hold state. And the judge followed up and said, if you have a monolithic structure with transistors that hold state, that cannot meet your claim. He answered, if that's what you have, if that's what your chip is that doesn't meet the claim, that is what our chips help. So it wasn't a question of needing additional construction. It was a question of them not putting in evidence. If you look at their evidence, every single thing they cite at pages 23, I'm sorry, 13 and 26 through 29 of the red brief, every single citation is not having to do with the memory circuit. It has to do with how it's connected with these external bond wires, and they've added that as a limitation to the claim, as a limitation of the disclaimer, and therefore it really shouldn't be permitted. Look at Exergen. In Exergen, some of my partners offered a trial theory that didn't work, and they were denied because they twisted the claim construction in a way that it wasn't included. We all have to obey those claim constructions, and if we don't, then you can't prevail. Let's get to damages. My brother said that, you know, for example, at 5532 and 5533, there was a discussion of why these parts were so essential, but if you look at it closely, that's not what they say. What they say is, in fact, I'm sorry, 5332. What they say, in fact, is that these are very stilted statements. They don't tell us anything specific about these two patents. So at 5532, the question was, how do these patents address challenges with power management? And they say, well, there's a concept and things are used, but then tellingly their expert said at 5533 that the word PMIC, meaning which is the part that my brother said instantiates this technology, that's just one part of their power management which is on module, just one part of the DIMMS. So at a minimum, at a minimum, they had to apportion that 30%. They had to reflect what portion of that 30% actually was found in these patents. The same is true for the 060 and the 160. At 5544, and I think, Judge Stark, you asked a question about this, the evidence is very thin about how they're able to claim that the expansion from four high to eight high was the result of these inventions because it's admitted by everybody. Well, let me strike that. It's contended by Netlist that the four high also includes the invention. Okay, Counselor, we have your argument. Thank you.